UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
EMIL UYCHIAT,

Plaintiff,

v.

HOTEL-LIKE, INC. and DAVID G. SERANA,

Defendants.
---------------------------------------------------------------X

**MEMORANDUM AND ORDER**
22-CV-1730-SJB-ST

**BULSARA, United States District Judge:**

Plaintiff Emil Uychiat ("Uychiat") brought this case alleging sexual harassment and other related claims against David Serana and his company Hotel-Like. Uychiat worked for Serana and rented a room from him for two months and was regularly subject to a barrage of sexually suggestive remarks, questions, and conduct. Uychiat moved for summary judgment on the discrimination, retaliation, abuse of process, and defamation claims against both Defendants; however, the Court only evaluates the motion with respect to Serana, because Hotel-Like has defaulted. (*See* Pl.'s Mot. for Summ. J. dated Sep. 2, 2025 ("Pl.'s Mot."), Dkt. No. 85-2). For the reasons explained below, the motion is granted in part and denied in part.

<u>STANDARD FOR SUMMARY JUDGMENT</u>

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas.*

*Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In determining whether summary judgment is appropriate, [the Court] must resolve all ambiguities and draw all reasonable inferences against the moving party." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" in one of two ways. Fed. R. Civ. P. 56(c)(1). It may cite to portions of the record "including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials." *Id.* R. 56(c)(1)(A). Alternatively, it may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* R. 56(c)(1)(B); *cf. Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988).

In moving for summary judgment or answering such a motion, litigants are required by the Local Rules to provide a statement (a Rule 56.1 statement) setting forth purported undisputed facts or, if controverting any fact, responding to each assertion. *See* Loc. Civ. R. 56.1(a)–(b). In both instances, the party must support its position by citing to admissible evidence from the record. *Id.* R. 56.1(d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact). "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to

hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

Where claims in opposing Rule 56.1 statements are "genuinely disputed," the Court will consider the evidentiary sources of the claims. *Halberg v. United Behav. Health*, 408 F. Supp. 3d 118, 146 (E.D.N.Y. 2019) (adopting report and recommendation). In evaluating the sources of claims made in dueling Rule 56.1 statements, the Court cannot—as is true for the summary judgment motion as a whole—weigh evidence or assess the credibility of witnesses. *See United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994). Furthermore, "[l]egal arguments are impermissible in any Rule 56.1 Statement and are to be disregarded." *Taveras v. HRV Mgmt., Inc.*, No. 17-CV-5211, 2020 WL 1501777, at *2 (E.D.N.Y. Mar. 24, 2020); *Lawrence v. Cont'l Cas. Co.*, No. 12-CV-412, 2013 WL 4458755, at *1 n.1 (E.D.N.Y. Aug. 16, 2013) ("Both parties have submitted Local Rule 56.1 statements and responses to each other's statements that mix factual assertions with legal argument and therefore fail to meet the requirements of Local Rule 56.1. The facts . . . are taken from those assertions contained in the Local Rule 56.1 statements that comply with Local Rule 56.1[.]" (citations omitted)). The court may not grant summary judgment based on a fact in a Rule 56.1 statement—even if undisputed—not supported by admissible evidence. *E.g.*, *Giannullo v. City of New York*, 322 F.3d 139, 142–43 (2d Cir. 2003) (vacating grant of summary judgment to defendants based on facts enumerated in Rule 56.1 statement supported only by arguments in briefs rather than admissible evidence). The Court must also disregard conclusory denials that lack citations to

admissible evidence. *Rodriguez v. Schneider*, No. 95-CV-4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999) ("*Rule 56.1 statements are not argument.* They should contain factual assertions, with citation to the record. They should not contain conclusions[.]"), *aff'd*, 56 F. App'x 27, 29 (2d Cir. 2003). Also, where the opposing party fails to specifically controvert a numbered paragraph in the Rule 56.1 statement, the statement by the moving party "will be deemed to be admitted." Loc. Civ. R. 56.1(c). The Court also does not give any consideration to hearsay, speculation, or inadmissible evidence in evaluating declarations or affidavits. *Pacenza v. IBM Corp.*, 363 F. App'x 128, 130 (2d Cir. 2010) ("[A] court is obliged not to consider inadmissible evidence at the summary judgment stage[.]"); *Crawford v. Dep't of Investigation*, No. 05-CV-5368, 2007 WL 2850512, at *2 (S.D.N.Y. Oct. 1, 2007) ("[A] non-moving party 'must set forth specific facts showing that there is a genuine issue for trial;' he or she 'may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.'" (quoting *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005))), *aff'd*, 324 F. App'x 139, 143 (2d Cir. 2009).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Court finds the following facts—drawn from the pleadings, the parties' respective Rule 56.1 statements, and supporting affidavits and exhibits attached thereto—are undisputed unless otherwise noted.

Emil Uychiat was born in the Philippines and came to the United States on a J-1 visa in 2015. (Pl.'s Rule 56.1 Statement dated Sep. 2, 2025 ("Pl.'s 56.1 Stmt."), Dkt. No.

85-3 ¶¶ 1–2; Def.'s Resp. 56.1 Statement dated Jan. 22, 2026 ("Def.'s 56.1 Resp."), Dkt. No. 85-28 ¶¶ 1–2). David Serana runs two businesses, one of which is Hotel-Like; though Uychiat calls Serana the "owner," Serana asserts he is "a shareholder and officer" but does not own corporate assets. (*Id.* ¶ 3; Pl.'s 56.1 Stmt. ¶ 3; *see also* Dep. of David Serana ("Serana Dep."), attached to Pl.'s Mot. as Ex. B, Dkt. No. 85-6 at 64:10-15). Hotel-Like is an online business Serana incorporated in 2019, which rents houses and then lists room rentals through Airbnb. (Serana Dep. at 64:24–65:25, 66:9-10). It previously managed several rental properties, but has not conducted business since 2022—when it last engaged in any rentals—because of difficult economic conditions in the rental market. (*Id.* at 66:12–67:14).

Uychiat worked for Serana for about two months. (Pl.'s 56.1 Stmt. ¶ 15; Serana Dep. at 120:6-11). Uychiat claims to have been an employee of both Hotel-Like and Serana, (Pl.'s 56.1 Stmt. ¶¶ 15, 35), while Serana claims Uychiat worked "as an independent contractor to do some data entry" and "to drive [him]" on "some occasions." (Def.'s 56.1 Resp. ¶ 36; Serana Dep. at 92:12-16). Serana testified that Uychiat worked as an independent contractor for both Hotel-Like and for him individually—though the work for Serana personally consisted of driving Serana about two times. (Def.'s 56.1 Resp. ¶ 36; Serana Dep. at 93:21-24, 94:1-22). Uychiat earned $ 15 per hour for the data entry work for Hotel-Like, which he did in Serana's home. (Serana Dep. at 112:8-13, 114:10-16; Pl.'s 56.1 Stmt. ¶ 27; Def.'s 56.1 Resp. ¶ 27). Payment records reflect about 13 payments from Serana to Uychiat between November

6, 2021, and January 6, 2022. (Pl.'s 56.1 Stmt. ¶ 34; Serana Dep. at 118:22–120:18; *see also* 1099 Form, attached to Pl.'s Mot. as Ex. F, Dkt. No. 85-10).[1]

Serana individually also rents out several rooms in his Bethpage residence. (Pl.'s 56.1 Stmt. ¶ 9; Def.'s 56.1 Resp. ¶ 9). Uychiat rented a room in Serana's house beginning around the same time he began working for Serana—the precise chronology is disputed but immaterial. (*Id.* ¶¶ 52, 55; Pl.'s 56.1 Stmt. ¶¶ 52, 55; Serana Dep. at 92:12-16; Dep. of Emil Uychiat ("Uychiat Dep."), attached to Pl.'s Mot. as Ex. A, Dkt. No. 85-5 at 54:10-22). The rental was conducted pursuant to a one-year lease agreement. (Pl.'s 56.1 Stmt. ¶ 56; Def.'s 56.1 Resp. ¶ 56).

Shortly after Uychiat began working for and renting from Serana, Serana began making sexual jokes toward Uychiat that made him uncomfortable. (Pl.'s 56.1 Stmt. ¶¶ 63–64). According to Uychiat, Serana made "dick jokes," would ask if Uychiat had an erection or was aroused, and propositioned Uychiat for sex.[2] (*Id.* ¶¶ 64–66). Serana asked Uychiat multiple times if he could "taste [Uychiat's] sperm," including through text messages. (Pl.'s 56.1 Stmt. ¶¶ 77–78, 82; Text Messages, attached to Pl.'s Mot. as Ex.

[1] Serana attempts to dispute that Uychiat was ever paid hourly wages in his 56.1 response, saying "no wages were issued," because there were no timesheets or payroll systems, but the record evidence he points to offers no support for his denial. (Def.'s 56.1 Resp. ¶ 34 (citing Uychiat's deposition testimony that he was paid $ 15 per hour, his 1099 form, and the Zelle payment records)).

[2] The Court credits these facts, even though they are disputed by Serana, because the denials themselves are conclusory and unsupported by record evidence. (*E.g.*, Def.'s 56.1 Resp. ¶ 65 ("Defendant unequivocally denies making such statements[.]")). The general bases for Serana's disputes regarding these statements are the lack of corroborating third-party evidence, or the fact that Uychiat continued working for and renting from Serana without lodging a formal complaint. (*Id.* ¶¶ 64–66). None of that amounts to admissible evidence that Serana never made such comments.

C, Dkt. No. 85-7 at 25).[3] Uychiat testified that while working, Serana sometimes stood right behind him and asked to massage him, to the point that Uychiat locked himself in his room to avoid Serana. (Pl.'s 56.1 Stmt. ¶ 75; Uychiat Dep. at 71:11-21). When he began doing the data entry work in his room to avoid Serana, Serana would knock on Uychiat's door and send inappropriate text messages. (Pl.'s 56.1 Stmt. ¶ 84). Those texts were submitted with Uychiat's motion. Serana, for example: calls Uychiat "handsome" many times and expresses his attraction, says "I love you" and "I miss you," sends poetic and affectionate statements, writes "it's your fault, you're lovable," says "you're my catharsis, not fetish," asks various sexually suggestive questions, and apologizes repeatedly for his behavior. (*Id.* ¶¶ 85–113; *see generally* Text Messages). Serana told Uychiat to block his number so Uychiat would not receive the messages. (Pl.'s 56.1 Stmt. ¶ 128; Def.'s 56.1 Resp. ¶ 128; Serana Dep. at 155:5-22). However, Uychiat testified he did not actually do so. (Uychiat Dep. at 93:20-21).

Serana also separately admitted this at his deposition:

> Q. What types of things would you text to him, sir?
> A. I text him that—that he's like a—a god, you know. I texted him, like: I like him. . . .
> Q. You texted him that you liked him sexually -- in a sexual way, didn't you?
> A. Yes.
> Q. And you told him things that you wanted to do to him sexually, didn't you?
> A. Yes.

---

[3] Serana "admits sending inappropriate messages" and "inappropriate content." (Def.'s 56.1 Resp. ¶¶ 77–78, 82). The Court does not detail the content of all these messages here. Serana only denies that admissible proof of the text messages exists because the screenshots only reflect the sender's side, not the recipient's. (*Id.*). That does not render the evidence inadmissible.

Q. And you told him things that you wanted him to do to you sexually, didn't you --
A. Yes.
Q. -- in those text messages to him, correct?

(Serana Dep. at 156:2-16). It is undisputed that no sexual contact or relationship ever occurred, that Uychiat never told Serana that he wanted a sexual relationship, and that Uychiat told Serana to leave him alone. (Pl.'s 56.1 Stmt. ¶¶ 152–53, 157; Def.'s 56.1 Resp. ¶¶ 152–53, 157).

In addition, Serana also began threatening to "find[ ] a way for [Uychiat] to be deported." (Text Messages at 37). These threats first seem to appear following messages in which Serana complains to Uychiat for speaking to him only through a closed door. (*Id.* at 30, 37).

Uychiat eventually told Serana that he was going to tell Serana's wife and son about the harassment, and did so. (Pl.'s 56.1 Stmt. ¶ 162; Serana Dep. at 205:4-7). Serana then called the police and filed a Family Court petition seeking an order of protection against Uychiat. (Pl.'s 56.1 Stmt. ¶ 162; Def.'s 56.1 Resp. ¶ 162). Serana also sent Uychiat messages under an alias saying "I will make sure you GET DEPORTED," because Uychiat's visa had expired. (Kat Messages, attached to Pl.'s Mot. as Ex. J, Dkt. No. 85-14 at 4; Serana Dep. at 191:20-21). Though he now attempts in conclusory fashion to dispute his testimony, (Def.'s 56.1 Resp. ¶¶ 174–78)—something that has no legal effect—Serana also testified that he sent Uychiat's girlfriend messages through an account under a different name, falsely claiming to have had a sexual relationship with Uychiat:

Q. Sir, isn't it true that you communicated with Mr. Uychait's girlfriend, Natalie, through your Levi Goldberg account?
A. Yeah.
Q. And isn't it true that you told her that you and Emil had a sexual relationship with each other?
A. Yeah.
Q. Why did you do that, sir?
A. I don't know.

(Serana Dep. at 194:23–195:11; *see also* Goldberg Messages, attached to Pl.'s Mot. as Ex. K, Dkt. No. 85-15).

Uychiat testified he felt compelled to move out of Serana's house because he "could not stand his harassment" and did not "want to deal with this sexual relationship . . . that he was offering."[4] (Uychiat Dep. at 166:8-22). For example, though Serana permitted Uychiat to use the home's internet and kitchen—although internet was not included in the lease—on January 2, 2022, Serana texted Uychiat: "You rejected me. You will be rejected 7 times 7 . . . Again, never use the kitchen. But you can use the bathroom." (Pl.'s 56.1 Stmt. ¶ 197; Def.'s 56.1 Resp. ¶ 197; Text Messages at 32). The messages continue, without response from Uychiat: "Can we talk tomorrow . . . Yes? NO? See, you don't even answer . . . Can we talk? Ok I'll change the internet password tomorrow and you're barred using the Internet." (Text Messages at 34). Serana then continues to demand oral sex or a one-hour massage in exchange for the wifi password, which Uychiat rejects. (*Id.* at 42). Uychiat moved out on January 6, 2022. (Pl.'s 56.1 Stmt. ¶ 220; Def.'s 56.1 Resp. ¶ 220).

---

[4] Serana claims Uychiat moved for entirely unrelated reasons—that Uychiat had caused an accident while driving Serana's car, and Serana's insurer recommended that Uychiat live at a different address so that if he gets in another accident, he would not be associated with Serana's address. (Serana Dep. at 218:5-13).

Serana filed four state court actions against Uychiat, all of which were later withdrawn. (*Id.* ¶ 193; Pl.'s 56.1 Stmt. ¶ 193). On February 18, 2022, Serana texted Uychiat: "Let's reconcile. . . . I'll withdraw all 4 cases." (Text Messages 2, attached to Pl.'s Mot. as Ex. T, Dkt. No. 85-24 at 17).

Uychiat filed this Complaint on March 29, 2022. (Compl., Dkt. No. 1). The Complaint brings claims against both Defendants for race and national origin discrimination and retaliation under 42 U.S.C. § 1981, (*id.* ¶¶ 221–45); national origin and sex discrimination and retaliation under the Fair Housing Act ("FHA"), (*id.* ¶¶ 246–57); and intentional infliction of emotional distress, (*id.* ¶¶ 322–28). The Complaint brings discrimination and retaliation claims under the New York State Human Rights Law ("NYSHRL") for race, ethnicity, national origin, and sex discrimination against Hotel-Like only. (*Id.* ¶¶ 258–84). Finally, as against Serana only, the Complaint brings claims for aider-and-abettor liability for discrimination and retaliation under the NYSHRL, (*id.* ¶¶ 285–95); assault and battery, (Compl. ¶¶ 296–307); abuse of process, (*id.* ¶¶ 308–21); and defamation, (*id.* ¶¶ 329–44).

Though Serana and Hotel-Like were initially represented by counsel, the Court granted their attorney's motion to withdraw on April 23, 2025, and stayed discovery for 45 days to give Defendants an opportunity to retain new counsel. (Min. Order dated Apr. 23, 2025, Dkt. No. 59). The Court later prompted Defendants to provide a status update on the retention of counsel. (Order dated Sep. 3, 2025). Serana informed the Court that he would proceed pro se, and that he understood Hotel-Like, as a corporation, is unable to retain counsel and could not participate in summary judgment

briefing. (Notice dated Sep. 11, 2025, Dkt. No. 66). Accordingly, the Court directed Uychiat to complete prosecution of his case against Serana prior to moving for default judgment against Hotel-Like. (Order dated Sep. 12, 2025, Dkt. No. 68).

Summary judgment briefing was protracted. The parties could not agree on a schedule, as Serana requested almost six months to serve his opposition (from September 2, 2025, when Uychiat served his motion, to February 20, 2026). (Mot. for Extension of Time dated Sep. 19, 2025, Dkt. No. 69 at 2). The Court set a deadline of November 6, 2025, but nevertheless granted multiple extensions through January 22, 2026, with a warning that further extensions would not be granted. (Order dated Dec. 24, 2025). On January 22, 2026, Serana requested another ten-day extension so he could file his opposition electronically, rather than manually, since his PACER/ECF account had not yet been activated. (Mot. for Extension of Time dated Jan. 22, 2026, Dkt. No. 75). The Court denied the extension, directed Serana to file his opposition by January 30, 2026, and noted that it would be considered late, but the Court would take his pro se status into account in determining what portions of his late filing to consider. (Order dated Jan. 23, 2026).

Serana did submit his opposition on January 30, 2026, which Uychiat then moved to strike because Serana's memorandum of law consisted of approximately 17,000 words, excluding an additional 2,500-word appendix of case citations. (Pl.'s Mot. to Strike dated Feb. 9, 2026, Dkt. No. 83 at 1). Uychiat also sought to strike Serana's filing for violating the Court's bundling rule, introducing new exhibits not previously disclosed, attaching over 2,000 pages of irrelevant medical records, and embedding

multiple "declarations" that contain legal argument throughout the exhibits he submitted. (*Id.* at 2). The Court denied the motion in light of Serana's pro se status, but noted it would only consider the first 8,750 words of Serana's opposition, consistent with the Local Rules, and would consider whether Uychiat had a fair opportunity to conduct discovery on the matters in any new exhibits. (Order dated Feb. 10, 2026). The fully briefed motion, including the abridged version of Serana's opposition, was filed on the Court's docket on February 13, 2026. (Pl.'s Mot.; Def.'s Opp'n to Pl.'s Mot. dated Jan. 22, 2026 ("Def.'s Opp'n"), Dkt. No. 85-27; Pl.'s Reply in Further Supp. of Pl.'s Mot. dated Feb. 13, 2026 ("Pl.'s Reply"), Dkt. No. 85-34).

## DISCUSSION

Uychiat moved for summary judgment on his § 1981, NYSHRL, and FHA claims, which are alleged against both Defendants. (Pl.'s Mot. at 1). He also seeks summary judgment on his abuse of process and defamation claims against Serana. (*Id.*). Because, as noted above, the Court directed Uychiat to complete his case against Serana prior to any default judgment motion against Hotel-Like, the Court only considers the claims against Serana.

### I. Sex Discrimination and Retaliation Claims

#### A. Employment Discrimination under the NYSHRL[5]

[5] Uychiat's Complaint asserts these claims against Serana as an aider and abettor. (Compl. ¶ 287). His motion for summary judgment, however, seeks liability on a direct liability theory—there is no mention of aiding and abetting liability. That is not a barrier, because the factual matter necessary for direct liability was adequately pleaded in the Complaint and argued in summary judgment briefing. *E.g.*, *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 57 (2d Cir. 2012) ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim." (quotation omitted)).

Uychiat argues he was subjected to sex discrimination in the form of daily sexual harassment. (Pl.'s Mot. at 7, 20-21, 24). The NYSHRL forbids harassing conduct that results in "inferior terms, conditions or privileges of employment" because of sex. N.Y. Exec. Law § 296(1)(h).[6] A plaintiff need not "demonstrate the existence of an individual to whom the employee's treatment must be compared." *Id.* The conduct also does not need to be "considered severe or pervasive under precedent applied to harassment claims," but it must "rise above the level of what a reasonable victim of discrimination with the same protected characteristic or characteristics would consider petty slights or trivial inconveniences." *Id.* The NYSHRL covers independent contractors and employees alike, so the exact category Uychiat falls into is irrelevant. *See Karupaiyan v. Experis US Inc.*, No. 24-0580, 2025 WL 615179, at *2 n.1 (2d Cir. Feb. 26, 2025).

[6] Uychiat erroneously asserts (and thus both parties procced under the theory) that these NYSHRL claims are analyzed pursuant to Title VII principles. (Pl.'s Mot. at 15). The conduct at issue occurred from 2021 to 2022, after the NYSHRL was amended "to align with the [New York City Human Rights Law's ("NYCHRL")] more liberal pleading standard." *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 123 (2d Cir. 2024); *see* N.Y. Exec. Law § 300 ("The provisions of this article shall be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of this article, have been so construed."). Though there is some dispute among district courts as to the ultimate standard for NYSHRL liability—whether it is identical or merely closer to the NYCHRL, *e.g.*, *Toomey v. One Equity Partners*, No. 24-CV-4088, 2026 WL 458244, at *7 (S.D.N.Y. Feb. 18, 2026) (noting the ambiguity as an open question)—the Court need not weigh in on that debate here. The evidence establishes Serana's liability under any of the standards, including a Title VII one. *See Banks v. Gen. Motors, LLC*, 81 F.4th 242, 261 (2d Cir. 2023) (explaining the Title VII standard, which requires showing "that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment.").

In the mere two months that Uychiat worked for Serana, primarily doing data entry work for Serana's company Hotel-Like, Serana made repeated sexual jokes and comments, propositioned Uychiat for sex, made sexual advances, and sent numerous messages of infatuation with Uychiat. (*See generally* Text Messages). Uychiat went so far as to lock himself in his room to work because he was so uncomfortable. (Uychiat Dep. at 71:11-21). The barrage of sexually explicit comments and messages materially worsened the conditions of Uychiat's employment, and puts the question of a hostile work environment due to sexual harassment beyond dispute. *E.g.*, *Legg v. Ulster County*, 979 F.3d 101, 115 (2d Cir. 2020) (affirming that "pervasive presence and use of pornographic magazines and screensavers (including by supervisory officers), sexual comments made by various officers about Watson's body, and the several specific incidents with Officer Divorl and his ongoing behavior were sufficient for a reasonable jury to conclude that Watson was subjected to a hostile work environment"); *Menos v. Uncle Nearest, Inc.*, No. 22-CV-1449, 2025 WL 917347, at *9–*11 (E.D.N.Y. Mar. 25, 2025) (determining that a jury could find two instances of unwanted physical contact, inquiries into plaintiff's personal life, and late-night text messages constitute harassment under the NYSHRL).

Serana does not meaningfully contest Uychiat's motion on this claim (including with respect to any specific element). His only arguments to the contrary are baseless objections the Court rejected above—namely that "sender-side" text message evidence is inadmissible. (Def.'s Opp'n at 16, 27).

Thus, the Court grants Uychiat's motion for summary judgment on his NYSHRL sex discrimination claim against Serana.[7]

**B. Employment-Based Retaliation Under the NYSHRL**

"A plaintiff claiming retaliation must demonstrate that [he] took an action opposing [his] employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 45 (2d Cir. 2025) (quotation omitted). As part of a retaliation claim, the NYSHRL requires a plaintiff to show "a causal connection between the protected activity and the alleged retaliatory conduct." *Id.* at 53. "To show causation under the NYSHRL . . . , a plaintiff need only show that retaliatory animus was a motivating factor, that is, that it played any role at all in the challenged conduct." *Id.* at 49 (quotation omitted).

Uychiat does not present any cogent argument or clear evidence that he experienced retaliation in his employment as a result of his complaints about or opposition to Serana's sexual harassment. Uychiat's briefing muddles together disparate claims that fall under separate legal standards and factual settings and uses catchwords, not legal doctrine or facts, to advance his retaliation claim. The specific retaliatory conduct is never identified. The sole theory he presents suggests his housing "was contingent upon (and part of) his employment with Defendants," (Pl.'s Mot. at

[7] Serana provided the Court significant context of his psychological and neurological disabilities, incurred in connection with his military service. (Def.'s Opp'n at 2–4). Serana only provided it to "frame the procedural posture" of this case. (*Id.* at 4). He himself acknowledges that he "does not seek immunity, mitigation of liability, or absolution" based on these disabilities. (*Id.* at 3).

18), so his "eviction" was in retaliation. In other words, his housing was an employment benefit that was removed because he complained about harassment occurring while working. But the record—which he never cites—does not support that claim. Serana offered to rent Uychiat a room in his home "to make it easier and convenient for Plaintiff to work for Serana." (Pl.'s 56.1 Stmt. ¶ 52; Def.'s 56.1 Resp. ¶ 52; *see also* Uychiat Dep. at 52:3-18). There is no basis for the Court to conclude that the two—housing and employment—were interdependent or contingent upon the other. Or that the housing was an employment-related benefit. Without any basis for the Court to conclude that there was retaliation in employment based upon his engaging in protected activity, Uychiat's motion for summary judgment is denied.

### C. Housing Discrimination and Retaliation under the NYSHRL and FHA

Uychiat moves for summary judgment on his claim of a hostile housing environment under the NYSHRL and FHA, and related retaliation claims. However, he has not shown his entitlement to judgment on these claims either.

"Rule 56 does not allow district courts to automatically grant summary judgment on a claim simply because the summary judgment motion, or relevant part, is unopposed." *Creaven v. Erickson*, No. 22-0874, 2023 WL 4247213, at *3 (2d Cir. June 29, 2023). "Rather, before summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed, and the court must determine whether the legal theory of the motion is sound." *Id.* (quotation omitted); *e.g.*, *Green Mountain Holdings (Cayman) LTD v. 501 Lafayette Ave LLC*, No. 21-

CV-5844, 2025 WL 2494292, at *7–*12 (E.D.N.Y. Aug. 28, 2025) (evaluating defenses raised in an answer even where summary judgment was unopposed). The Court is not convinced that Uychiat's legal theories are sound for either of these claims.

Beginning with the FHA, it expressly exempts protection as applied to "rooms or units in dwellings containing living quarters occupied or intended to be occupied by no more than four families living independently of each other, if the owner actually maintains and occupies one of such living quarters as his residence." 42 U.S.C. § 3603(b)(2). The exemption is an affirmative defense to FHA liability, *United States v. Space Hunters, Inc.*, 429 F.3d 416, 426 (2d Cir. 2005), and one that was raised in Serana's answer. (Answer dated Oct. 25, 2022, Dkt. No. 16 at 57–58). Uychiat never meaningfully addresses that exemption. He makes various arguments as to other provisions, namely § 3603(b)(1), which has an entirely different set of criteria and elements. *See* 42 U.S.C. § 3603(b)(1). But as to the § 3603(b)(2) exemption, he merely affirms "Serana also rented three other rooms in the home in which Plaintiff and Serana stayed." (Pl.'s Reply at 10). In light of the failure to seek summary judgment on Serana's affirmative defense, and the failure to make any argument as to why the § 3603(b)(2) exemption does not apply, Uychiat's motion for summary judgment on his FHA claims is denied.

A similar problem precludes summary judgment on Uychiat's NYSHRL claims for housing discrimination and retaliation. NYSHRL housing protections do not apply to "the rental of a room or rooms in a housing accommodation, if such rental is by the occupant of the housing accommodation or by the owner of the housing

accommodation and the owner resides in such housing accommodation." N.Y. Exec. Law § 296(5)(a)(4)(i)(3). Uychiat offers no explanation as to why he is entitled to summary judgment in the face of this exemption.

In summary, the Court grants summary judgment for Uychiat on his NYSHRL claim for hostile work environment. But the motion is denied as to his employment retaliation claim under the NYSHRL. The motion is also denied with respect to his claims for a hostile housing environment under the NYSHRL and FHA, and for housing-based retaliation.

## II. Race, Ethnicity, and National Origin Discrimination and Retaliation

Uychiat seeks summary judgment on his § 1981, NYSHRL, and FHA race discrimination and retaliation claims. (Pl.'s Mot. at 19, 23).

### A. Section 1981 Discrimination in Employment and Housing

"[T]o state a claim under . . . Section 1981 . . . a plaintiff must allege facts supporting [a defendant's] intent to discriminate against him on the basis of his race [or ethnicity]." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 80 (2d Cir. 2021) (quotation omitted); *see also A.L.M. ex rel. Moore v. Bd. of Managers of Vireum Schoolhouse Condo.*, No. 19-2771, 2021 WL 5121137, at *2 (2d Cir. Nov. 4, 2021) ("[A] plaintiff must prove the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute." (quotation omitted)).

The record is undeniably replete with Serana's threats to contact immigration authorities with the aim of "mak[ing] sure [Uychiat] get[s] deported" because Uychiat's

"J1 [visa] expired." (Pl.'s Mot. at 16–17). But Uychiat has not pointed to any facts that establish those threats, which often reference Uychiat's visa overstay, were based on his race or ethnicity. If anything, the testimony shows such motivations were not present:

> Q. And the reason you said you was going to get him deported was because of his—because he's Filipino, right?
> A. I don't know. I don't know the reason. You get deported to—to back to your country if your stay expired.

(*Id.* at 17 (quoting Serana Dep. at 192:6-9)). There is no basis to infer, from the statements Uychiat points to, that Serana's threats were motivated by race.

The single district court case Uychiat relies on in support of his argument does not compel a different result. In *Chica v. Shallu Construction Corp.*, the Court found that an employer's threats to call immigration authorities on employees who asked for a raise "were plainly on the basis of race: the clear inference is that [the employer] assumed that plaintiffs, because of their Hispanic ethnicity, were immigrants and undocumented." No. 21-CV-0869, 2022 WL 970744, at *12 (E.D.N.Y. Mar. 31, 2022). There is no comparable inference here—there is no evidence of animus or stereotyping on the basis of Uychiat's Filipino race or ethnicity, as opposed to comments based on Uychiat's visa overstay.

Summary judgment is denied on this claim.

**B. NYSHRL Discrimination in Employment and Housing**

Uychiat makes no separate argument as to his NYSHRL race discrimination claim, which also requires discrimination "because of" race, ethnicity, or national origin. *See* N.Y. Exec. Law § 296; *Francis*, 992 F.3d at 80. It therefore fails for the same reason as his § 1981 claim.

### C. FHA Discrimination

The same defect precludes summary judgment on Uychiat's FHA claim for race discrimination. "The FHA makes it unlawful '[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race[.]" *Francis*, 992 F.3d at 72–73 (quoting 42 U.S.C. § 3604(b)). Once again, Uychiat has not pointed to any evidence of race discrimination, and summary judgment on that claim is denied.

### D. Race-Based Retaliation in Employment and Housing

A retaliation claim under any of the three statutes—§ 1981, the NYSHRL, and the FHA—requires the plaintiff to show he engaged in protected activity. *See Knox v. CRC Mgmt. Co., LLC*, 134 F.4th 39, 49 (2d Cir. 2025) (explaining that under § 1981 and the NYSHRL, a plaintiff must show he "engaged in activity protected under the relevant statute" and "a causal connection between [the] protected activity and [the adverse action]"); *Dickerson v. BPP PCV Owners LLC*, No. 24-3147, 2026 WL 731024, at *2 (2d Cir. Mar. 16, 2026) ("A plaintiff alleging retaliation under the FHA must show that a defendant took adverse action against the plaintiff, and a causal connection exists between the protected activity and the adverse action[.]" (quotation omitted)). Protected activity must be in opposition to conduct made unlawful by the statute. *See Ikedilo v. Statter*, No. 23-7947, 2025 WL 1011346, at *5 (2d Cir. Apr. 2, 2025) (discussing § 1981); *Lynn v. Village of Pomona*, 212 F. App'x 38, 41 (2d Cir. 2007) (explaining that retaliation requires the plaintiff to have exercised a right protected by the FHA in the first instance).

There is no evidence in the record that Uychiat ever complained about, opposed, or in any way engaged in protected activity with respect to race discrimination. Because he has not shown that he opposed unlawful race discrimination under § 1981, NYSHRL, or the FHA, he cannot prevail on a race-based retaliation claim. *E.g.*, *McIntosh v. H&M Hennes & Mauritz LP*, No. 25-CV-4350, 2026 WL 1867801, at *5 (S.D.N.Y. May 5, 2026) (finding no protected activity where plaintiff made no mention of race-based discrimination in her complaints), *report and recommendation adopted*, 2026 WL 1866633 (June 29, 2026); *Phillips v. United Food & Com. Workers Union Loc. 2013*, No. 23-CV-8283, 2025 WL 2659087, at *11 & n.10 (S.D.N.Y. Sep. 17, 2025) (§ 1981 and NYSHRL); *Dickerson*, 2026 WL 731024, at *2 (FHA).

In summary, Uychiat's motion for summary judgment on his claims for race discrimination under § 1981, the NYSHRL, and the FHA, both in the employment and housing context, and attendant retaliation claims, is denied.

## III. Abuse of Process

"In New York, an abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Smith v. County of Nassau*, No. 24-2569, 2026 WL 1330787, at *2 (2d Cir. May 12, 2026) (citation modified).

Uychiat argues Serana is liable for abuse of process because he filed four frivolous lawsuits against Uychiat, for the sole purpose of harassing or retaliating

against Uychiat. (Pl.'s Mot. at 24). He also argues that the filings contained defamatory statements. (*Id.*).

"[T]he mere 'institution of a civil action by summons and complaint is not legally considered process capable of being abused.'" *Manhattan Enter. Grp. LLC v. Higgins*, 816 F. App'x 512, 514 (2d Cir. 2020) (quoting *Curiano v. Suozzi*, 63 N.Y.2d 113, 116 (1984)). "Because no such interference [with person or property] flows from the issuance of a civil summons, the commencement of a civil action cannot, by itself, support a plaintiff's claim for abuse of process, even when the civil action was 'intended to cause the plaintiff[ ] expense and to burden [him] with the defense of a protracted legal proceeding.'" *Id.* (quoting *Curiano*, 63 N.Y.2d at 116). Accordingly, a "frivolous lawsuit," without more, namely interference with one's person or property, is not "actionable as abuse of process." *See id.*

Uychiat identifies no abuse of process beyond the initiation of the actions themselves, which is insufficient to merit summary judgment. *E.g.*, *Boyd v. Lansbury*, No. 23-CV-7459, 2025 WL 948360, at *3 (E.D.N.Y. Mar. 28, 2025) (dismissing abuse of process claim premised on a complaint based on false statements). In sum, there is no "sufficient collateral objective to satisfy that element of a cognizable malicious abuse of process claim." *Peter L. Hoffman, Lotte, LLC v. Town of Southampton*, 523 F. App'x 770, 771 (2d Cir. 2013).

Uychiat's motion for summary judgment on this claim is denied.

## IV. Defamation

Under New York law, a defamation plaintiff must establish: "(1) a written or spoken defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or *per se* actionability." *Lewis v. R.L. Vallee, Inc.*, No. 24-1438, 2025 WL 1077412, at *3 (2d Cir. Apr. 10, 2025).

Uychiat does not argue that any of Serana's statements were per se defamatory in his summary judgment motion.[8] Accordingly, he must identify special damages for this claim to be actionable. He identifies damages from costs for mental health care and legal fees he has incurred as a result of Serana's harassment. (Pl.'s Mot. at 26). Neither constitutes special damages.

"Special damages consist of the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 179 (2d Cir. 2000) (quotation omitted); *see Franklin v. Daily Holdings, Inc.*, 135 A.D.3d 87, 93 (1st Dep't 2015) ("Special damages consist of the loss of something having economic or pecuniary value, which must flow directly from the injury to reputation caused by the defamation and not from the effects of the defamation."). Legal fees incurred in bringing a defamation claim do not qualify. *E.g.*, *Dance Theatre of Harlem, Inc. v. ChromaDiverse, Inc.*, No. 25-CV-2978, 2026 WL 891992, at *12 (S.D.N.Y. Mar. 31, 2026) ("To hold that legal fees incurred in

---

[8] In contrast to the Complaint, which does assert a per se liability theory for statements regarding criminal and sexual conduct. (Compl. ¶ 342).

bringing an injurious falsehood lawsuit can themselves qualify as the required special damages would undermine that element of the tort, and there is no support for doing so in the case law."). Out-of-pocket medical costs are not either. *Bernstein v. O'Reilly*, No. 17-CV-9483, 2019 WL 10995110, at *5 (S.D.N.Y. Sep. 26, 2019) ("Emotional distress from a plaintiff's knowledge that he or she was defamed is not special harm, even if it resulted in out-of-pocket medical costs."). Accordingly, Uychiat has not identified any special damages, and has not established his defamation claim as a matter of law.

The motion for summary judgment on the defamation claim is denied.

## CONCLUSION

For the reasons explained above, Uychiat's motion for summary judgment is granted in part and denied in part. The motion is granted as to Uychiat's claim of sex discrimination in employment under the NYSHRL. The motion is otherwise denied. Because the Court has identified legal deficiencies with Uychiat's claims for race discrimination, housing discrimination and retaliation, defamation, and abuse of process, Uychiat is directed to show cause, in a letter not exceeding 3,000 words, why those claims should not be dismissed, by **September 24, 2026.** Alternatively, Uychiat can simply agree to dismissal of these claims with prejudice. Following resolution of these issues, the Court will set a deadline for submission of a joint pretrial order.

SO ORDERED.

*/s/ Sanket J. Bulsara*
SANKET J. BULSARA
United States District Judge

Date: August 25, 2026
Central Islip, New York